UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KEELY SPADA ROTUNNO, | * CIVIL ACTION NO. |
| Plaintiff, | * |
| v. | * |
| | * SEPTEMBER 20, 2012 |
| TOWN OF STRATFORD, | * |
| Defendant. | * |

## COMPLAINT

### PARTIES AND RELATED PERSONS AND ENTITIES

1. Keely Spada Rotunno (hereinafter "Spada" or "Plaintiff") is a Connecticut resident with a home address of 1598 Main Street, Stratford, Connecticut.

2. The Town of Stratford (hereinafter "the Town" or "Defendant") maintains offices at 2725 Main Street, Stratford, Connecticut.

3. The United Public Service Employees Union Local Dispatchers (hereinafter "UPSEU") is an employee organization that brought a grievance against Defendant on behalf of Plaintiff before the State of Connecticut Department of Labor Board of Mediation and Arbitration (hereinafter "the Labor Board").

### JURISDICTION

4. This matter is brought pursuant to 42 U.S.C. section 1983, thus raising a question of federal law.

5. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the plaintiff's state law claims.

6. Venue is proper in this Court; the parties reside or are located in Connecticut.

**PROCEDURAL HISTORY**

7. UPSEU filed a grievance action against Defendant on behalf of Plaintiff before the Labor Board on or about February 25, 2011, claiming that Plaintiff's termination violated the parties' collective bargaining agreement because Plaintiff was terminated without just cause.

8. On or about April 30, 2012, after a hearing, the Labor Board found in favor of Defendant on the limited basis that the termination did not violate the collective bargaining agreement.

**BACKGROUND**

9. Defendant is a municipal employer under Connecticut law.

10. Plaintiff began working for Defendant as a civilian 911 emergency dispatcher on May 7, 1996.

11. Defendant and UPSEU were parties to a collective bargaining agreement (hereinafter "CBA"), which provided that "[a]ll disciplinary actions, suspensions and discharges, shall be for just cause."

12. Plaintiff was terminated by the Town's Human Resources Director, Ronald Ing, on February 25, 2011, by letter.

13. At the time of her termination, Plaintiff was a senior dispatcher for police, fire, and emergency medical services ("EMS").

14. Defendant's dispatch services were always short-handed. As a result, Plaintiff worked a staggering amount of overtime. For example, her base pay in 2010

and 2011 was $57,000. However, her income in 2010 was in excess of $90,000 and in 2011 it was in excess of $100,000. Thus, Plaintiff earned more than $33,000 in overtime pay in 2010 and more than $43,000 in overtime pay in 2011.

15. Plaintiff averaged seventy to eighty work hours per week.

16. During one particularly busy time, Plaintiff worked forty-three days straight without a day off.

17. Before her termination, the last time Plaintiff was out of work for illness was in 2008.

18. The Town's dispatchers were given no formal training.

19. In 2006, the dispatchers had no supervisor, even though the Town had budgeted for one.

20. On or about December 6, 2006, Plaintiff received a written letter of reprimand from her then-supervisor, Brian S. Lindwall-Thomas, which stated in part that Plaintiff had failed "to follow proper protocol when dispatching Fire and EMS to a medical call on October 18, 2006." The letter continued, "You chose to contact a mutual aid ambulance first before dispatching the Fire Department, which is not the proper protocol. Due to the fact that you chose to not follow the proper procedure you delayed medical care arriving to the patient in a timely manner. Your actions did not cause harm, however I need to remind you that if you continue to not follow the proper protocol when dispatching a mutual aid call or any other call for that matter, you would cause harm to someone in need."

21. On April 16, 2008, Plaintiff signed a "Last Chance Agreement" in lieu of termination for alleged acts of insubordination that related to a phone conversation

Plaintiff had with then-EMS-Chief Donna Best.  The Last Chance Agreement stated in part that "any further acts of insubordination . . . shall result in immediate termination" and that "any acts of insubordination, to include negative or insulting comments will result in immediate termination."

22.   In or around October 2010, junior dispatcher Tracy Ianucci (hereinafter "Ianucci"), also known as Tracy Zerheidi, filed a written complaint with the human resources director, Ronald Ing (hereinafter "Ing"), in which she accused Plaintiff of harassment.

23.   The Ianucci complaint was without merit.

24.   After he had interviewed Plaintiff and other witnesses, Ing found on January 11, 2011, that because "none of the possible witnesses could confirm or deny" Ianucci's allegations, no discipline would be imposed on Plaintiff.  Rather, he created a five-point list of actions to be taken, which included both individuals interacting with one another in a professional manner.

25.   On or about December 20, 2010, Deputy Fire Chief Curtis Maffett (hereinafter "Maffett") interviewed Plaintiff as part of an investigation regarding three alleged civilian complaints for unprofessional behavior while handling their phone calls.

26.   On or about December 22, 2010, Fire Chief James Cavanaugh (hereinafter "Cavanaugh") issued a memorandum, which stated in relevant part that Plaintiff's explanations had justified some of her conduct "and did identify some areas of dispatch operations that need to be addressed, [they did] not justify [her] negative attitude and actions in these incidents."

27.   Notably, the Town did not invoke the Last Chance Agreement at this time.

28. The dispatchers had been physically relocated from the police department to a space above the fire department. Although the fire chief supervised the building, he was not supervising the dispatchers, an issue raised by the plaintiff on numerous occasions to the Town.

29. Although the Town had budgeted for up to fourteen slotted dispatchers, those slots were never filled.

30. Plaintiff was the only dispatcher with a dedicated pension, for which she was required to reach twenty-five years of employment to receive.

31. Plaintiff served as a union steward and on the bargaining unit of the Union local.

32. Plaintiff requested during negotiations between the Town and the bargaining unit that a supervisor be retained for the dispatchers. The Town would not agree to the retention of a supervisor.

33. Plaintiff notified various persons, including the fire chief, assistant fire chief, and the human resources director, on numerous occasions that public safety was being endangered by the lack of adequate staff and by the inferior set-up of the office.

34. Working conditions at the Town's dispatch office were nearly intolerable. The dispatchers put a cot in the office so that there was a place to sleep. There were supposed to be three dispatchers working at all times, but there often were only two. A regular shift for Plaintiff was from 8:00 a.m. to 12:00 midnight.

35. Also during January 2011, Plaintiff had a friendly personal conversation on a recorded landline telephone with two police officers, in which all of the parties made

admittedly negative and insensitive comments about Ianucci, the junior dispatcher who had complained about Plaintiff in the past, and her husband, a Stratford police officer.

36.   Ianucci was not present and did not hear the comments at the time of the phone conversation.

37.   An unknown person later provided Ianucci with copies of audio discs containing the taped conversations.

38.   Ianucci has a history of filing written complaints against co-workers and janitorial staff and has been publicly referred to as "a pain in the ass" and "crazy" by then-Fire-Chief James Cavanaugh because of all the written complaints she had filed against others.

39.   Senior dispatchers have a history of not filing written complaints, preferring instead to work things out personally.

40.   On or about January 8, 2011, Plaintiff worked a Saturday shift, which was not normally part of her regular schedule. Plaintiff worked that day with Laura Fee Price, a dispatcher who had been employed with the Town for approximately two years.

41.   During their shift, Plaintiff observed Price fighting with her husband on the telephone, on the Internet for personal reasons, and going outside to smoke.

42.   Three dispatchers were working on that day. It was a very busy day, with three priority calls coming in at the same time at one point.

43.   Plaintiff, a senior dispatcher with sixteen years of experience, observed that Price was not getting the correct information and that she was not putting the information on the screen. In particular, Plaintiff noted that Price was dispatching EMS before the fire department, which, as Plaintiff had been notified of by the December 6,

2006, letter referred to above in paragraph 19, was improper protocol and potentially hazardous.

44. Plaintiff advised Price that proper protocol was to dispatch the fire department first and EMS second. Price's response was to give Plaintiff the finger.

45. Offended, Plaintiff responded saying something to the effect of, "if you ever give me the finger again, I will break it off and shove it up your ass."

46. Price apparently made a complaint about the incident to the human resources department, but management never spoke to Plaintiff about it. Plaintiff did not perceive any problems with Price thereafter. Price's complaint stated in part, "[h]er argument with me was concerning the fire response for medical calls, and why I generate a fire card second to ems. I told her that when someone calls for an ambulance that is the card that I start with and as the call progresses, if a fire response is required, it is then that I generate a fire card and the information is auto entered from the ems card. She did not agree with that."

47. Price also complained about "vulgar outbursts and salacious comments" regarding restroom "behavior" she claimed Plaintiff had made about her in the past.

48. The general tenor and atmosphere of the job was rather coarse, with swearing and vulgar language common among all of the employees.

49. On February 5, 2011, the Chief of Police told Plaintiff, "you need to get a union rep."

50. Based on the complaints by Ianucci and Price, Ronald Ing conducted an investigation that consisted of interviewing the two complaining junior dispatchers and

dispatcher Jeremy Moore, as well as listening to the audio discs of Plaintiff's phone conversation with the two Stratford police officers.

51. Ing did not interview Plaintiff in the course of his investigation.

52. Ing never sought out, and therefore did not interview, any witnesses as part of his investigation who could have exonerated Plaintiff, such as senior dispatcher Kim Freer.

53. Ing did not conduct a comparative discipline study of similar misconduct as part of his investigation of the complaints about Plaintiff.

54. Ing completed his investigation on February 18, 2011.

55. Prior to completion of his investigation, Ing told certain staff that he was "probably going to terminate" Plaintiff because of the complaints by Price and Ianucci.

56. On February 18, 2011, Ing told UPSEU representative Ronald Suraci that he would be terminating Plaintiff for violation of her Last Chance Agreement; thus, Suraci would need to go to Stratford for a Loudermill hearing.

57. On February 25, 2011, the Town terminated Plaintiff's employment, allegedly for violation of her Last Chance Agreement, insubordination, harassment of a co-employee, and unprofessionalism.

58. As of the time Plaintiff was terminated, the last three union representatives, Plaintiff included, were either fired or retired under duress.

59. After Plaintiff was terminated, the Town hired a supervisor/manager for the dispatchers.

60. Overwhelming evidence exists that arguing, cursing, and throwing insults was common behavior amongst all dispatch employees. The dispatchers consistently

engaged in so-called "negative mentoring" and gossip, and many were disciplined for it, yet none but Plaintiff was terminated for such behavior.

61. Plaintiff's termination was pre-textual and was in fact retribution for Plaintiff having repeatedly exposing the Town's wrongful actions in overseeing and maintaining its dispatch operations.

## COUNT ONE
## 42 U.S.C. § 1983 - DEPRIVATION OF FIRST AMENDMENT RIGHTS

62. The allegations of paragraphs 1 through 61 of the Complaint are repeated and realleged as if set forth fully herein.

63. The Plaintiff's speech regarding the understaffing and lack of supervision of the dispatch operations was protected by the First Amendment of the United States of America.

64. In terminating the Plaintiff, the Town was acting under the color of state law.

65. The Plaintiff's speech concerned a matter of vital public interest, as it concerned the Town's ability to respond to emergency calls for police, ambulance or fire services made by the public to the dispatch center.

66. The Plaintiff was terminated as a result of and in retaliation for her speech, which is an adverse employment action on the Town's part.

67. A causal connection exists between the Plaintiff's protected speech and the Town's termination of the Plaintiff's employment.

68. The Plaintiff's speech was a motivating factor in the Town's decision to terminate her employment.

69. Plaintiff's exercise of her First Amendment and Connecticut constitutional rights to express herself to the Town's officials did not substantially or materially

interfere with her *bona fide* job performance or with her working relationship with the Town.

70. As a result of the aforementioned unlawful conduct of the Town, the Plaintiff has suffered significant losses, including emotional distress, embarrassment, mental anguish, humiliation, damage to her reputation, and financial diminution in the form of increased personal expenses, reduced earnings, lost wages, lost benefits, loss of promotional opportunities, depletion of personal savings, loss of enjoyment of life, and loss of enjoyment of profession.

71. As a further result of the Defendant's conduct, the Plaintiff has incurred and will continue to incur attorney's fees and costs in pursuing this claim.

WHEREFORE, the Plaintiff claims:

    a. compensatory damages, including but not limited to lost wages, lost benefits, a depletion of personal savings, emotional distress, mental anguish, humiliation, embarrassment, loss of enjoyment of life, and loss of enjoyment of profession;

    b. back pay;

    c. front pay;

    d. interest and costs;

    e. punitive damages;

    f. attorney's fees and legal costs; and

    g. such other relief in law or equity as this Court deems appropriate and equitable.

## COUNT TWO
## GENERAL STATUTES § 31-51q

72. The allegations of paragraphs 1 through 71 of the Complaint are repeated and realleged as if set forth fully herein.

73. The Plaintiff's speech regarding the understaffing and lack of supervision of the dispatch operations was protected by the Connecticut Constitution.

74. In terminating the Plaintiff, the Town was acting under the color of state law.

75. The Plaintiff's speech concerned a matter of vital public interest, as it concerned the Town's ability to respond to emergency calls for police, ambulance or fire services made by the public to the dispatch operation.

76. The Plaintiff was terminated as a result of and in retaliation for her speech, which is an adverse employment action on the Town's part.

77. A causal connection exists between the Plaintiff's protected speech and the Town's termination of the Plaintiff's employment.

78. The Plaintiff's speech was a motivating factor in the Town's decision to terminate her employment.

79. Plaintiff's exercise of her First Amendment and Connecticut constitutional rights to express herself to the Town's officials did not substantially or materially interfere with her bona *fide job* performance or with her working relationship with the Town.

80. As a result of the aforementioned unlawful conduct of the Town, the Plaintiff has suffered significant losses, including emotional distress, embarrassment, mental anguish, humiliation, damage to her reputation, and financial diminution in the form of increased personal expenses, reduced earnings, lost wages, lost benefits, loss of

promotional opportunities, depletion of personal savings, loss of enjoyment of life, and loss of enjoyment of profession.

81. As a further result of the Defendant's conduct, the Plaintiff has incurred and will continue to incur attorney's fees and costs in pursuing this claim.

WHEREFORE, the Plaintiff claims:

    a. compensatory damages, including but not limited to lost wages, lost benefits, a depletion of personal savings, emotional distress, mental anguish, humiliation, embarrassment, loss of enjoyment of life, and loss of enjoyment of profession;

    b. back pay;

    c. front pay;

    d. interest and costs;

    e. punitive damages;

    f. attorney's fees and legal costs; and

    g. such other relief in law or equity as this Court deems appropriate and equitable.

## COUNT THREE
## WRONGFUL TERMINATION

82. The allegations of paragraphs 1 through 81 of the Complaint are repeated and realleged as if set forth fully herein.

83. The actions taken by the Town resulted in the wrongful, retaliatory termination of the Plaintiff.

84. The Plaintiff's discharge was in retaliation for her actions in speaking out publicly in collective bargaining negotiations and in discussions with other public officials concerning the staffing deficiencies in the dispatcher office and the lack of supervision of the emergency dispatchers.

85. The wrongful termination of the Plaintiff undermined the important public policy of ensuring public safety and responding to calls for help in an efficient and cost-effective manner.

86. The adverse employment actions taken against the Plaintiff were the result of the plaintiff's exercise of her rights to freedom of speech and to petition the government for redress of grievances, as guaranteed under the First Amendment of the United States Constitution and Sections Four and Fourteen of Article One of the Connecticut State Constitution.

87. The Town was Plaintiff's employer.

88. Plaintiff made reports to the Town during union negotiations and in discussions with public officials regarding her concerns about the lack of staffing, the hours worked, and the lack of supervision in the dispatch center.

89. The lack of staffing, the long hours worked by dispatchers, the lack of supervision and the generally poor management of the dispatch center is a matter of public concern in the Town of Stratford.

90. Plaintiff's statements were not made as part of her official duties.

91. As a result of her termination, Plaintiff has experienced emotional distress, embarrassment, hardships related to child care, damage to her reputation, and financial diminution in the form of increased personal expenses and reduced earnings.

92. Plaintiff's statements and acts that led directly to the termination were protected by the First Amendment to the United States Constitution and Sections 4 and 14 of Article One of the Connecticut Constitution.

93. The aforementioned wrongful conduct on the part of the Defendant was intentional in that it was willful, wanton, and/or was taken with reckless disregard for the Plaintiff's rights.

94. Plaintiff's exercise of her First Amendment and Connecticut constitutional rights to express herself to the Town's officials did not substantially or materially interfere with her *bona fide* job performance or with her working relationship with the Town.

95. As a result of the aforementioned unlawful conduct of the Defendant, the Plaintiff has suffered significant losses, including emotional distress, embarrassment, mental anguish, humiliation, hardships related to child care, damage to her reputation, and financial diminution in the form of increased personal expenses, reduced earnings, lost wages, lost benefits, loss of promotional opportunities, depletion of personal savings, loss of enjoyment of life, and loss of enjoyment of profession.

96. As a further result of the Defendant's conduct, the Plaintiff has incurred and will continue to incur attorney's fees and costs in pursuing this claim.

WHEREFORE, the Plaintiff claims:

    a. compensatory damages, including but not limited to lost wages, lost benefits, a depletion of personal savings, emotional distress, mental anguish, humiliation, embarrassment, loss of enjoyment of life, and loss of enjoyment of profession;

    b. back pay;

    c. front pay;

    d. interest and costs;

    e. punitive damages;

    f. attorney's fees and legal costs; and

    g. such other relief in law or equity as this Court deems appropriate and equitable.

PLAINTIFF,
Keely Spada Rotunno

BY: _____
Theodore W. Heiser
ct23807
Sullivan Heiser, LLC
4 Post Office Square
Clinton, Connecticut 06413
(860) 664-4440
(860) 664-4422 (fax)
twh@sullivanheiser.com

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KEELY SPADA ROTUNNO, | * | CIVIL ACTION NO. |
| Plaintiff, | * | |
| v. | * | |
| | * | SEPTEMBER 20, 2012 |
| TOWN OF STRATFORD, | * | |
| Defendant. | * | |

### JURY TRIAL CLAIM

The plaintiff, Deborah Fabian, claims a trial by jury on all claims triable by jury.

PLAINTIFF,
Keely Spada Rotunno

BY: _____
Theodore W. Heiser
ct23807
Sullivan Heiser, LLC
4 Post Office Square
Clinton, Connecticut 06413
(860) 664-4440
(860) 664-4422 (fax)
twh@sullivanheiser.com